843 So.2d 606 (2003)
Debbie HOLT, Plaintiff-Appellant,
v.
BETHANY LAND COMPANY and Darel Cupp, Defendants-Appellees.
No. 36,888-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
Rehearing Denied May 8, 2003.
*607 Larry Steven Butler, Bossier City, William Jarred Franklin, for Appellant.
Richard E. Hiller, Shreveport, for Appellees.
Before BROWN, STEWART and DREW, JJ.
DREW, J.
Debbie Holt, plaintiff, appeals from a judgment denying her demand for damages arising from the allegedly wrongful eviction of her paintball business. For the following reasons, we affirm in part and reverse in part.

FACTS
On February 19, 1999, plaintiff and Bethany Land Company, Inc. (Bethany) executed a written agreement captioned "Option to Purchase" pertaining to an unimproved 40-acre tract of land in Caddo Parish. The option period was for one year beginning March 1, 1999. Holt agreed to pay beginning April 1, 1999, $568.00 per month for 12 months, at the first of each month, without being more than 15 days late twice or more than 30 days late once. In the alternative, Holt was to pay $6,000.00. If Holt violated the agreement by being late as provided in the Option to Purchase, she was to be considered in default and to have forfeited payments up to that point. If Holt timely made payments for this 12-month period, Bethany agreed to execute an act of credit sale within 10 days and sell the property to Holt for $56,000.00 payable at $568.00 per month (9% interest for 180 months) to the vendor. The payments made were to be credited against the purchase price. The contract contained no provisions giving Holt the right to occupy *608 the land for the initial 12-month period.
The contract was subsequently amended to provide for a lower purchase price ($44,000.00) and monthly payment ($446.28) in exchange for which Holt would not be entitled to the construction or maintenance of a road or water line. This second contract did not contain the provision allowing one 15-days-late payment and no 30-days-late payments.
Holt began operating a paintball field on the property and gradually added improvements to make the property suitable for that use. During the course of the first year, Holt had problems with various persons, including hunters and oil company employees, entering upon the property and damaging access roads. In an effort to keep these unauthorized persons off of the property, attorney Richard Hiller wrote letters to several of the persons. Hiller was the attorney for Bethany and Darel Cupp, the principal and 100% owner of Bethany. In a July 12, 1999 letter, Hiller wrote: "I represent Debbie Lou Holt with respect to the property referenced above ... Holt is presently leasing this property from Bethany Land Company...." In an August 11, 1999 letter, Hiller wrote, "... I have been informed by the lessee, Debbie Holt, that...." Holt was copied on the August letter. She was also copied on other letters that do not refer to her as the lessee but indicate generally that she is the occupant of the property. Hiller billed Holt for these letters.
A dispute arose regarding the timeliness of Holt's payments. Cupp decided that the allegedly tardy payments were a breach of the option to purchase agreement, and in April 2000, Hiller wrote to Holt's attorney and stated that the letter constituted the five-day notice to vacate required by Louisiana law. In May, 2000, Hiller sent Holt's attorney two letters. In the first letter, he demanded payment of $800 because "[Holt] has been possessing the property for two (2) months, March and April 2000, without paying due compensation.... Failure to [pay] will result in the institution of eviction proceedings." A second letter in which he stated that his earlier letters were in error insofar as they implied that "this was a lessor/lessee situation requiring an eviction notice and proceeding. Your client was simply acquiring an option to purchase the property with her monthly payments, nothing more nothing less." In early May 2000, Cupp padlocked the entrance to the property and refused to allow Holt regular access. Holt's paintball business failed thereafter.
Holt then sued Cupp and Bethany seeking specific performance of the contract and damages for wrongful eviction, attorney fees, mental anguish and loss of earnings from her paintball and carpet businesses (the latter allegedly closed due to "time ... resolving this matter"). By this time, Cupp had caused Bethany to transfer the land into Cupp's name. Cupp answered the lawsuit and filed a reconventional demand seeking damages for restoring the property to its original condition and for the loss of marketability caused by the litigation.
Holt filed a motion to disqualify Hiller as Cupp's attorney because Hiller had represented Holt previously both in writing letters pertaining to the property and in an unrelated civil matter. Cupp opposed the motion and urged that Hiller was protecting Cupp's interest by keeping trespassers off of the property. The trial court denied the motion to disqualify Hiller and this court denied Holt's application for supervisory review on the limited showing made in the application. When the matter came for trial, Holt indicated her intention to call Hiller as a witness. *609 However, Hiller was not listed on Holt's witness list and the trial court refused to allow the attorney to be a witness. Holt's attorney submitted a proffer consisting of his own opinion about what would have been Hiller's testimony; specifically, that Hiller represented Holt in efforts to displace the trespassers and that Hiller did not advise Holt of her right to proceed against Cupp due to the interruption in Holt's possession of the property.
Regarding Holt's allegedly tardy payments, the record reflects that Holt paid more than the required amount each month of her obligation and that she paid at least three of the payments after the 15th day of the month. Cupp said that he determined that Holt was in default after her November payment was late but that he did not return her subsequent checks because "she was still using the property." The trial court observed that the sum of the overpayments exceeded one month's payment by the due date of the second late payment and concluded that the late payments were, under the terms of this particular contract, excusable. That conclusion led the court to grant specific performance of the contract in favor of Holt. That portion of the trial court judgment is not at issue on appeal.
Holt's appeal concerns the trial court's rejection of her damages allegedly resulting from Cupp's closing of the property to Holt. Holt testified that during the negotiations with Bethany, she told Cupp that she intended to use the property as a paintball field, and she said that he gave her "permission" to do so. She testified:
A: Those three times that we come out and looked at the land, we explained to him we wanted it for a paintball field. Upon signing the contract, he said I had access to the land. He even saidI've got it in my paperwork someplace, I've go to find iteither you or Robin signed for Bethany Land Company for me to put electricity out there. Obviously if we had electricity, that meant I was occupying the land. He knew right off the bat we was doing paintball, because he come out on numerous occasions.
Q: And is it your testimony that if Mr. Cupp on behalf of Bethany Land Company told you one day you could use the property, could that be rescinded the next day, in your mind?
A: Not in my mind, no. I didn't have an attorney, and I was told the contract was as good as gold, basically, and the way it was led to me was that I had possession of the land. I could keep the land for twelve months, make my payments. Once the payments were met, then it would be deeded over to me. Again, I'm not an attorney, so I guess I didn't understand the lingo.
Q: I see. So it was your understanding that when Mr. Cupp permitted you to go on the property, that was a twelve-month contract; correct?
A: Yes, sir, I assumed. He even told me I could move my mobile home out there if I wanted to.
On redirect examination, Holt testified about the 1999 letters from Hiller (pp. 200-201):
Q: Had you seen these letters?
A: Yes, sir.
Q: Did they lead you to believe you had a lease?
A: Well, that, and along with verbal conversations, yes, sir.
Q: And you referred to it as your property because you felt like it was your property?
A: Well, I was making the payments, and I felt is was going to be mine, just like if you're buying a car and you're making the payment, it's your car. *610 Cupp testified that the arrangement with Holt was not a lease.
A: But let me point out one thing that there may have been another misunderstanding about. Holt never at any time had any legal right on that property. She bought an option to purchase, and that was it. She never had a lease. She never had any right to step foot on the property. She asked me if she could use it to play paintball games, and I told her she could, and we never discussed anything further than that. But as far as a legal right, she had absolutely none. There's none stipulated in that option agreement.
Q: So you were just letting her hang out on your property for free?
A: She asked me, she said, "I'm getting involved in paintball." She said "Do you mind if some of us, you know, friends of mine come out here and play paintball on the weekends?" I said, "I have no objection."
Q: You didn't know she was running a business out there, sir?
A: She told me she was charging, yes, but I still didn't object to it. But that didn't give her the right to use the property.
Q: You said she could do it. That gives her the right to do it.
A: I permitted her to do it, but she had no right to do it. I never guaranteed her she could continue to do it. It was a permissive thing.
Q: You gave her permission
A: I gave her permission.
Q: to occupy the property?
A: I gave her permission. I gave her permission to use the property, to come out and be on the property, but she had no legal right to use the property.
He further testified:
Q: Did you ever indicate to Holt that she was leasing the property?
A: No, because that was never in my mind that she was leasing it.
Q: Did you ever lead her on to believe that she was?
A: No.
Holt's fiancee, David Waters, testified about the operation of the paintball business and that it would cost from $2,500 to $3,000 to ready the property for paintball again. Economist Dr. Harold Christensen estimated that Holt had suffered between $30,000.00 and $32,000.00 in lost revenues due to the closing of her business.
After hearing the evidence, the trial court granted specific performance of the option contract in favor of Holt, finding that she had satisfied the terms of the contract. However, the court denied Holt's request for damages, finding that "Any possession that was granted, rather (sic) it's verbal or inferred from the agreement, was gratuitous. As a result, there is no warranty of peaceful possession as might be found either in a contract regarding a deed or a contract regarding a lease." The court also denied Cupp's reconventional demand. Holt now appeals.

DISCUSSION
Holt urges that the trial court erred by not awarding her damages for Cupp's "bad faith" refusal to perform under the option contract, by not awarding her damages for breach of the "lease" agreement and the subsequent wrongful eviction and by refusing to allow her to call Mr. Hiller as a witness.
An appellate court may reverse a lower court's factual findings when the record (1) reflects that a reasonable factual *611 basis does not exist for the finding and (2) establishes that the finding is clearly or manifestly wrong. Stobart v. State, DOTD, 617 So.2d 880 (La.1993). If a court of appeal finds that the trial court committed reversible error of law or manifest error of fact, the court of appeal must determine the facts de novo from the record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840 (La. 1989).

1. "Bad Faith" Refusal to Perform.
As noted, the first option contract specified that Holt would be in default of the agreement if payment due on the first of the month was over 15 days late on two occasions or more than 30 days once. The subsequent option contract did not contain the late payment provision; it specified that the payments were "due on the first day of each subsequent month...." There is no testimony about the reason for this change. The date of execution of this subsequent agreement is unclear, but appears to have been prior to April 1, 1999, the date of the first payment contemplated under the subsequent agreement. Holt made numerous payments after the first day of the month during the remainder of the period, and by the strict terms of the second agreement, these payments were late.
Under the terms of the revised Option to Purchase, Holt owed payments of $446.28 on the first of each month for a total of $5355.36. Evidence indicated Holt made payments as follows:

-----------------------------------------------------------------------
Date Due Date of Amount Excess Payment Balance due
 Payment Holt Paid Amounts on $5355.36
------------------------------------------------------------------------
4/1/99 4/19/99 $ 600 $153.72 $4735.36
5/1/99 5/5/99 $ 600 $307.44 $4155.36
6/1/99 6/14/99 $ 500 $361.16 $3655.36
7/1/99 7/11/99 $ 500 $414.88 $3155.36
8/1/99 8/10/99 $ 500 $468.60 $2655.36
9/1/99 9/9/99 $ 500 $522.32 $2155.36
10/1/99 10/23/99 $ 500 $576.04 $1655.36
11/1/99 11/17/99 $ 450 $579.76 $1205.36
12/1/99 12/2/99 $ 450 $583.48 $ 755.36
1/1/00 1/?/99 $466.28 $583.48 $ 309.08
2/1/00 2/10/99 $ 450 $587.20 - $ 140.92
3/1/00 $140.92 - $ 140.92
----------------------------------------------------------------------------

Cupp perceived Holt's performance to be substandard under the initial phase of the agreement, since she was more than 15 days late on three occasions. This was a facially valid but factually erroneous reason to cancel the purchase agreement. Holt considered that her payments in excess of the required $466.28 eliminated any complaint about the timeliness of her payments. As the trial court noted, by September 2000, Holt was one entire payment ahead prior to the October and November late payments. The subsequent "late payments" could reasonably have been viewed as having been made early by Holt, since *612 the funds required to meet the October and November payments were received in September and October.
Under La. C.C. art.1996, an obligor in good faith is liable for only the damages that were foreseeable at the time the contract was made. However, an obligor in bad faith is liable for all damages, whether or not foreseeable, that are a direct consequence of the failure to perform. La. C.C. art.1997. The comments to art. 1997 state that "[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." Bad faith under art. 1997 generally implies actual or constructive fraud, not an honest mistake as to the actual rights and duties. Dorsett v. Johnson, 34,500 (La.App.2d Cir.5/9/01), 786 So.2d 897, writ denied, 01-1706 (La. 9/28/01), 798 So.2d 115. We find no error in the trial court's denial of Holt's assertions of bad faith.

2. Verbal or Oral Lease of Immovable Property.
As with a sale, three things are absolutely necessary to have a valid lease; i.e., thing, price, and consent. La. C.C. art. 2670. Nothing in the law prohibits the verbal lease of immovable property. La. C.C. art. 2683. It is the sale of immovables which must be in writing. La. C.C. arts. 1839 and 2440. It has long been the law that no written agreement is necessary to perfect the lease of an immovable unless the parties contemplate that the lease will be effective only upon the execution of a written agreement. Compare, e.g., Auto-Lec Stores v. Ouachita Valley Camp. No. 10, 185 La. 876, 171 So. 62 (1936), where the supreme court reversed the sustaining of an exception of no cause of action in favor of the lessor of a building who refused to sign but nevertheless performed under a written lease agreement. If a verbal lease includes all essential elements and the parties act upon it, neither may withdraw on the pretext that the lease was not reduced to writing. Russell v. City of New Orleans, 98-0927 (La. App.4th.Cir.2/24/99), 732 So.2d 66, writ denied 99-1563 (La.10/8/99), 750 So.2d 968.
Because there is no requirement that the contract be in written form, the required elements may be proven through testimony and other corroborating circumstances. La. C.C. arts. 1832, 1846. If a lease existed, the late payment of rent would not necessarily be grounds for termination of the lease upon the proper showing. See Ergon, Inc. v. Allen, 593 So.2d 438 (La.App. 2d Cir.1992).
In this case there is insufficient evidence to show that Bethany or Cupp consented to the lease of the property. Holt testified that it was her understanding or assumption that she could use the property during the option year, but her testimony was insufficiently specific to prove that the parties agreed that this use would constitute a lease. Likewise, the indications in the letters from Mr. Hiller that the arrangement was a lease were made to third persons for the purpose of protecting the property owner's right against trespass and are not substantial evidence that the parties intended a lease. The language of both the original and the amended Options to Purchase provided that Holt's payments were the price of Holt's obtaining the right to buy the property. Her occupancy of the land was not a part of those documents. Had the parties intended for a lease in favor of Holt to be included in the price of the option to purchase, that language could have been included in the instruments. There was no testimony as to any agreement by the parties as to a price for a lease of the property. Notwithstanding Holt's assumption that she could occupy of the property, Cupp's consent for her to occupy *613 the land and the attorney's referring to her as a lessee in certain correspondence, an essential element for a lease, price, is absent. The trial court did not err in concluding that there was no lease by which Holt occupied the property.
However, the evidence is sufficient to show that Cupp, and through him, Bethany, should have known that Holt would, and did, rely to her detriment on Cupp's promise to let Holt use the property. La. C.C. art.1967 provides, in part:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
A claim of detrimental reliance must meet three requirements: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change in position to one's detriment because of the reliance. Miller v. Miller, 35,934 (La.App.2d Cir.5/8/02), 817 So.2d 1166, writ denied, 02-1890 (La.10/25/02), 827 So.2d 1154. Detrimental reliance is not favored in our law and is sparingly applied as it bars the normal assertion of rights otherwise present. Id. As noted, there was no particular formal requirement in this case.
Mr. Cupp admitted that he allowed Holt to use the property for her paintball business and that he knew she was conducting a business on the premises. Cupp visited the site on several occasions while the property was being used for paintball and personally saw the improvements made to the property by Holt. It is inescapable that he knew that Holt not only would, but in fact did, rely on his promise to her that she could use the property for paintball.
Where a fact finder does not reach an issue because of an earlier finding which disposes of the case, the court of appeal, in reversing the earlier finding, must make a de novo determination of the undecided issues from the facts in the record. LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766. The reviewing court must make an award that is just and fair for the damages revealed by the record, where the trial court, as here, has made no award for damages. Id.
We believe that the record before us is adequate to determine the proper award of damages to Holt for the wrongful breach of promise. David Waters, Holt's partner, testified that it would require between $2,500 and $3,000 in materials to rebuild the playing fields given the amount of rope, plywood and wood posts needed. Holt testified that paintballs, which have a limited shelf life, were ruined while the paintball operation closed. We accept the $3,000 figure as most realistic given the description of the property by all parties and the fact that Holt also had to replace paint supplies which ruined during the closure.
The estimate of damages for lost profits is too speculative to support an award. The economist testified in some detail concerning the data upon which his estimates were based. He did not have Holt's tax returns for the relevant periods, and Holt's business records for this time were very limited. Further, his corroboration of paint costs were by telephone to "Pete" at a Dallas paint company and to "some accountant" at a South Carolina paint company. There was little showing that the other data acquired about paintball businesses was appropriate for the type of part-time paintball business Holt *614 operated, and the economist's estimate of start-up costs was entirely unsupported by appropriate data. Accordingly, we believe that an award of $3,000.00 in damages will adequately compensate Holt under these particular circumstances.

3. Refusal to Allow Mr. Hiller to Testify.
As noted, plaintiff did not include Richard Hiller on her witness list and the trial court balanced that fact with the explanation offered for the need of Hiller's testimony: that Hiller represented Holt in efforts to displace the trespassers and that the attorney did not advise Holt of her right to proceed against Cupp due to the interruption in Holt's possession of the property. Holt's attorney did not include a proffer of the witness's testimony but, instead, gave his impression of what that testimony might have been. In the absence of a proper proffer and with the lack of a showing of the relevance of Hiller's testimony to the issues at hand, we find no error in the trial court's refusal to allow Holt to call Hiller as a witness.

CONCLUSION
For the above-assigned reasons, the judgment of the trial court is reversed insofar as it denied damages to Holt. We hereby award Debbie Holt $3,000.00 in damages plus judicial interest from the date of judicial demand against the defendants. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendants.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART.
STEWART, J., concurs with reasons.
BROWN, C.J., concurs. I also believe that there was a lease.
STEWART, J., concurs.
I agree that there was no error in the trial court's denial of Holt's assertions of bad faith and to the award of damages. However, I disagree that there was no lease in this case. The appellant's testimony, along with the actions of the appellees and their attorney, is enough evidence to prove there was a lease. Obviously, the price of the lease was the monthly payments being made.

APPLICATION FOR REHEARING
Before BROWN, C.J., WILLIAMS, STEWART, CARAWAY, and DREW, JJ.
Rehearing denied.